JASON BLOODGOOD, Appellant, *v.* ANN AYERS et al., Respondents.

A spring, from which no stream or water-course runs, but the source of which and the flow of its waste or surplus waters are alike under ground, and so, matters of speculation or uncertainty, belongs to the owner of the land and he may divert and use the waters.

Except as regards certain underground streams or rivers which are known and notorious and flow in natural channels between defined banks, sub-surface currents or percolations are not governed by the rules and regulations respecting the use and diversion of water-courses, and they may be intercepted or diverted by the owner of the land for any purpose of his own.

(Argued January 20, 1888; decided February 28, 1888.)

APPEAL from order of the General Term of the Supreme Court in the third judicial department, made September 8, 1885, which reversed, "both upon questions of law and fact," a judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term. (Reported below, 37 Hun, 356.)

This action was brought to restrain an alleged wrongful diversion of the waters of a spring on defendants' land from their natural channel.

The facts so far as material are stated in the opinion.

*James B. Olney* for appellant. The diversion of the water of the spring was an injury to plaintiff for which he was entitled to recover damages. (*Colrick* v. *Swinburne*, 105 N. Y. 503; *Arnold* v. *Foot*, 12 Wend. 330; *Smith* v. *Adams*, 6 Paige, 435; *Clinton* v. *Meyers*, 46 N. Y. 511; *Gardner* v. *Newburgh*, 6 John. Ch. 164; *Delhi* v. *Youmans*, 45 N. Y. 362; 50 Barb. 316; *Broadbent* v. *Ramsbotham*, 34 Eng. L. & E. 513; *Rawston* v. *Taylor*, 33 id. 428; *Dudden* v. *Guardians*, 1 H. & N. 627; 36 Eng. L. & E. 536; *Howe* v. *Norman*, 13 Rep. 155; *Tolle* v. *Corrith*, 31 Tex. 362; *Wadsworth* v. *Tillotsen*, 15 Conn. 366; *Enklich* v. *Richter*, 41 Wis. 318; 37 id. 236; *Hoyt* v. *Hudson*, 27 id. 660; Washburn on

Easements, 210; Gould on Waters, § 536; *Enner* v. *Bar-well*, 2 Giff. 410; 4 L. T. [N. S.] 597; *Foot* v. *Van Gieson*, 4 Lans. 47; *Dunan* v. *Chilton Union Co.*, 1 H. & N. 627; *Howe* v. *Norman*, 13 R. I. 488; *Chatfield* v. *Wilson*, 27 Vt. 670; *Macomber* v. *Godfrey*, 11 Am. R. 351; 108 Mass. 219; *Bradley* v. *Wilcox*, 86 N. Y. 140, 143.) Underground currents of water which flow in well defined channels are subject to the same rules of law which govern the use of similar streams upon the surface; if it does not appear that the waters which come to the surface are supplied by a definite flowing stream, they are presumed to be formed by the ordinary percolations of water in the soil. (2 Gould on Waters, §§ 281, 542; *Dickinson* v. *Canal Co.*, 7 Exch. 301; Washburn on Easements, 370; Wood on Nuisances, 315, 316; *Shields* v. *Amdt*, 3 Greene's Ch. N. J. 234; *Johnson* v. *Jordan*, 2 Metc. 239.) The question as to reasonable use only applies where there has not been a total diversion. (*Colrick* v. *Swinburne*, 105 N. Y, 503; *Demarest* v. *Kellogg*, 29 Mich. 420; *Mann* v. *Hill*, 3 B. & A. 304; *Twiss* v. *Baldwin*, 9 Conn. 291; *Parker* v. *Griswold*, 17 id. 293; Wait's Actions & Def. 563; *Blanchard* v. *Baker*, 8 Greenl. 253; *Bealey* v. *Shaw*, 6 East, 208; 3 Kent's Com. [4th ed.] 439; *Wadsworth* v. *Tillotson*, 15 Conn. 273; *Agawam Canal Co.* v. *Edwards*, 36 id. 498; *Williams* v. *Morland*, 2 Barn & Cress. 913. *Ford* v. *Whitlock*, 27 Vt. 265; *Elliott* v. *Fitchburg R. R. Co.*, 10 Cush. 193.) It is, therefore, only for an abstraction and deprivation of the water of a stream, or for an unreasonable and unauthorized use, an action will lie. (*Embury* v. *Owen*, 6 W. H. & G., 353; *Wood* v. *Wood*, 3 id. 748; 10 Barb. 518; Angell on Water-courses, chap. 4; 3 Kent's Com. 439; *Tyler* v. *Williamson*, 4 Mason [R. I.], 397; *Anthony* v. *Lapham*, 5 Pick. 175; *Webb* v. *Portland Man. Co.*, 3 Sumner [Mass.], 189; *Dolling* v. *Mary*, 6 Ind. 324; *Coaltes* v. *Hunter*, 4 Randolph [Va.], 58; *Hartzell* v. *Lile*, 12 Penn. St. 248; *Williamson* v. *Canal Co.*, 78 N. C. 159; Wood on Nuisances, 355, 365 *et seq.*; *Pugh* v. *Wheeler*, 2

Dev. & B. 50, 53; *Van Holson* v. *Coventry*, 10 Barb. 522; *Relyea* v. *Beaver*, 34 Barb. 552; *Farrand* v. *Marshall*, 21 id. 419; *Pixley* v. *Clark*, 32 id. 272; *Pattison* v. *Richards*, 22 id. 146; *Garwood* v. *N. Y. C.*, 17 Hun, 361; 83 N. Y. 406; *Arnold* v. *Foot*, 12 Wend. 330; *Crocker* v. *Bragg*, 10 Wend. 265; *Clinton* v. *Myers*, 46 N. Y. 511; *Gardener* v. *Newburgh*, 6 Johns. Ch. 164; *Bealy* v. *Shaw*, 6 East, 214; *Prentice* v. *Geiger*, 74 N. Y. 345.) The relief to which the plaintiff is entitled is a restoration of the watercourse. (*Corning* v. *Troy Nail Factory*, 40 N. Y. 191; Gould on Waters, § 553; 2 Waite's Pr. 2, 3; *Cummings* v. *Barrett*, 10 Cush. 186; Wash. on Easements, 218; Wood on Nuisances, 355.) The diversion of all the water is actionable. (*Davis* v. *Fuller*, 12 Vt. 178; *Norton* v. *Valentine*, 12 id. 230; *Parker* v. *Hotchkiss*, 25 Conn. 321; *Webster* v. *Flemming*, 2 Humph. [Tenn.] 518; *Plumleigh* v. *Dawson*, 1 Gilman [Ill.], 544; *Miller* v. *Lapham*, 44 Vt. 416; *Snow* v. *Parsons*, 28 id. 49; 3 Kent's Com. 440.) If Mrs. Ayres had a right to take as much water as she and her grantees had been accustomed to take for twenty years, she could not, for that reason, divert the stream to plaintiff's injury, (Gould on Waters, 553 and notes; *Prentice* v. *Geiger*, 74 N. Y. 341; Angell on Water-courses [5th ed.], 137; *Pollitt* v. *Long*, 58 Barb. 32; *Carroll* v. *Deimell*, 95 N. Y. 252; *Griffiths* v. *Phelps*, 21 Weekly Dig. 390; *Sickles* v. *Flanagan*, 79 N. Y. 224; *Baird* v. *Mayor, etc.*, 96 id. 567, 577, 578.)

*Sidney Crowell* for respondents. This spring was not a natural water course. (*Barkley* v. *Wilcox*, 86 N. Y. 143; *Wagner* v. *R. R. Co.*, 2 Hun, 633; *Macomber* v. *Godfrey*, 108 Mass. 219; *Broadbent* v. *Ramsbotham*, 11 Exch. 602.) Mrs. Ayres had the right to use the water for watering cattle and other domestic purposes on the farm, even if the spring is a natural water course. (*Bullard* v. *Saratoga Victory Manuf. Co.*, 77 N. Y. 525; *Prentice* v. *Geiger*, 74 id. 341; Wood's Law of Nuisance, 363; Gould on Waters, 361; *Wadsworth* v. *Tillotson*, 15 Conn. 366; 39 Am. Dec. 391.)

Where a right exists to use a certain quantity of water, a change in the mode and objects of the use, without increasing the quantity,' is no violation of the right. (*Whittier* v. *Chicago Mfg. Co.*, 9 N. H. 382.) Mrs. Ayres and her predecessors, having by artificial means used and controlled the waters of this spring for the uses of her farm, acquired a right to the same. (*Law* v. *McDonald*, 9 Hun, 23; *Townsend* v. *McDonald*, 12 N. Y. 391; Wood on Nuisances, § 353; *Comstock* v. *Johnson*, 46 N. Y. 615; *Wakely* v. *Davidson*, 26 id. 387; *Cromwell* v. *Selden*, 3 id. 253.) Waters percolating or flowing under ground from this spring did not form a natural water course. (*Ellis* v. *Duncan*, 21 Barb. 230; *Goodale* v. *Tuttle*, 29 N. Y. 459; *Village of Delhi* v. *Youmans*, 45 id. 362; 50 Barb. 316; *Phelps* v. *Nowlen*, 72 N. Y. 46; *Routh* v. *Driscoll*, 20 Conn. 533.)

FINCH, J.   The General Term reversed the decision of the trial court mainly upon a single proposition which was founded upon undisputed evidence. A spring or at least a reservoir of water existed upon plaintiff's land, disclosing itself at the surface about twenty feet from the dividing line between the parties. The water from that reservoir followed depressions in the land across plaintiff's meadow to the road. It ran in no defined channel having natural banks, but flowed over the sod almost wholly without breaking it, following the lowest levels and sometimes spreading out over an acre or more. Its route could be traced by the deeper green of the grass which it watered, but it proved no obstruction when that came to be cut, for the evidence is that the plaintiff mowed across it habitually as if it were not there. He himself said in answer to the inquiry whether he could see the current, that in a wet time "you can see it a good ways," but in a dry time "you can see it may be two rods, but any one who did not know there was a spring there would not notice." When asked on cross-examination whether there were any banks to what he called the stream, he could not say that there were; and at the inquiry if there was a channel was evidently puzzled; and

saying there was no ditch cut, and then that he cut out a furrow, answered the question, four times repeated, by saying that he did not know how to answer it; and the inquiry being pressed once more, replied "of course there is a channel where the water flows." When asked the width of the channel, he replied, "there are so many different channels I don't know how to get at it; the water covers a couple of acres of my meadow." The next witness for plaintiff had seen the water run across the meadow during a freshet, but could not say as to any other time; while a third witness pressed to describe an obvious channel said only "the course the water did take through you could see by the grass." The plaintiff's sons described this flow somewhat stronger so far as the use of the words "bed" and "stream" were concerned, but without at all changing the facts. On the part of the defense it was shown that when water was visible on the meadow it was in times of freshet, when the water shed of twenty or thirty acres above poured rain or melting snows down the depression described. Very probably some portion of the water crossing the meadow came by percolation through the earth from defendant's spring above, but, granting that, it seems to us difficult to say from the evidence that there was a water-course across the plaintiff's land within the definition of that term which we have heretofore adopted. (*Barkley* v. *Wilcox*, 86 N. Y. 147.)

But the General Term put their conclusion upon another ground growing out of some further facts. Upon defendants' premises, and something over a hundred feet from plaintiff's line, there was a living spring which came up out of the earth and was carried by a short leader to a trough which had long served as a watering place for the stock of defendant and previous owners. At that trough, or within a few feet of it, all the waste or surplus water sank into the ground and disappeared. What became of it was in no manner obvious to the senses until by digging and experiment a probability was established. About a hundred feet from the spring, and within, perhaps, twenty feet of plaintiff's line, water appeared

upon the surface, sometimes seen to be in motion towards a sluice under the fence arranged for the passage of surface water mainly, or in part at least. At that sluice the water, except in times of freshet, again disappeared, but came to the surface about twenty feet on plaintiff's side of the line, and at the point where his spring or reservoir was established. His experiments, which he details, make it strongly probable that by percolation or subterranean currents more or less of the water of defendant's spring reached the plaintiff's spring or reservoir, but the fact, if it be one, is established only as the result of inference or reasoning. In this state of affairs the defendant carried the waters of his spring to his house for domestic uses, and so, it is claimed, intercepted the supply of plaintiff's reservoir, and for that alleged wrong this action was brought.

The General Term held that it could not be maintained, and we are of the same opinion. No stream or water-course ran from the spring. The source from which it came and the flow of its waste or surplus were alike under ground, concealed, and matters of speculation and uncertainty. Such a spring belongs to the owner of the land. It is as much his as the earth or minerals beneath the surface; and none of the rules relating to water-courses and their diversion apply. (*Broadbent* v. *Ramsbotham*, 34 Eng. L. and E. 513; *Rawston* v. *Taylor*, 33 id. 435; *Village of Delhi* v. *Youmans*, 45 N. Y. 362; *Goodale* v. *Tuttle*, 29 id. 466; *Ellis* v. *Duncan*, 21 Barb. 234; *Barkley* v. *Wilcox*, 86 N. Y. 147.) The only exception established by the authorities is that of certain underground streams or rivers which are known and notorious and flow in a natural channel between defined banks. A few such exceptions are admitted to exist, and others may occur; but, outside of these, sub-surface currents or percolations are not governed by the rules and regulations respecting the use and diversion of water-courses, and they may be intercepted or diverted by the owner of the land for any purpose of his own. The case first above cited resembles the present one in the feature that the action was to prevent

the interception and diversion of certain sources of supply reaching a water-course known as Longwood brook. One of these was a swamp or wet piece of ground, which the opinion describes as "merely like a spring, so to speak, fixed on the side of a hill;" and of the subterranean courses communicating with the swamp, which certainly existed, it was deemed a sufficient answer that they were "not traceable so as to show the water passing along them ever reaching Longwood brook." Another source of supply was described as a stream welling out of the ground at a depth of about two feet, which flowed into a receiving basin three feet square, used as a watering place. In those respects it resembled the spring in the present case, but unlike that, the surplus and waste, instead of disappearing in the ground, followed ditches and depressions in the surface until it reached the brook. Both supply sources were intercepted and diverted, and a right of action therefor denied — as to the first, on the ground that the subterranean currents were concealed and not traceable; and the second, upon the distinct proposition that the owner might intercept or stop them before they reached a natural water-course. In *Village of Delhi* v. *Youmans* (*supra*), it was said that the owner of land might lawfully intercept percolations or underground currents. The reasons and justification of the doctrine are well stated in *Acton* v. *Blundell* (12 M. & W. 324). They are, that, as the water does not flow openly in the sight of the owner of the soil under which it passes, there is no ground for implying consent or agreement between the adjoining proprietors, which is one of the foundations on which the law of surface streams is built; that a different rule would enable a lower proprietor to prevent the upper owner from using the water in his own soil, and expose him to loss and danger in making improvements on his own land; and a further reason is found in the indefinite nature of the right claimed and the great extent of obligation which would be incurred.

The law in other states is in accordance with the views here expressed. (*Haldeman* v. *Bruckhardt*, 45 Penn. 514; *Green-*

*leaf* v. *Francis*, 18 Pick. 117; *Frazier* v. *Brown*, 12 Ohio, 294; *Chatfield* v. *Wilson*, 28 Vt. 49; *Roath* v. *Driscoll*, 20 Conn. 533.); and the rule is strongly stated in Angell on Water-Courses (chap. 4, § 114) as being that "the owner of land on which a spring issues from the earth has a perfect right to it against all the world except those through whose land it comes, and has a right to it even as against them until it comes in conflict with their enjoyment of their own property." The proposition while very broadly stated, and somewhat open to criticism, embodies the substance of the prevailing doctrine as to the right of the owner to intercept and divert underground currents and percolations for his own uses without responsibility to a lower proprietor.

The judgment of the General Term should be affirmed and judgment absolute rendered for the defendants with costs.

All concur.

Order affirmed and judgment accordingly.