THE SPRINGFIELD WATERWORKS COMPANY, Appellant, v. R. S. JENKINS *et al.*, Respondents.

St. Louis Court of Appeals, April 9, 1895.

1. **Subterranean Streams:** RIGHT OF DIVERSION. The obstruction or diversion of a subterranean stream which has a well defined and known channel is illegal. But, when water filtrates or percolates through the soil or interstices of rock, the owner of the land through which it passes may divert or appropriate it for the improvement or benefit of his estate without giving an adjoining proprietor ground for complaint.

2. ———: ———. The right of appropriation in the latter case is not absolute or unlimited. The owner of land through which water thus percolates can not obstruct or divert it without benefit to himself or his land, and for the purpose merely of injuring an adjoining proprietor who is subjecting it to beneficial uses.

*Appeal from the Greene Circuit Court.*—HON. JAMES T. NEVILLE, Judge.

REVERSED AND REMANDED (*with directions*), BOND, J., *dissenting.*

*Benj. U. Massey* and *W. T. Tatlow* for appellants.

(1) There was a constant and regular flow of water coming by well defined channels—surface and subterranean—well known to the defendants, from the "Little Sac" creek to the Fulbright spring, and defendants had no right to disturb, impede or hold back this regular flow; they might modify or temporarily divert the flow to their own reasonable use, but not hold back and waste it. Washburn on Easements and Servitudes [2 Ed.], p. 276; *Haldeman v. Bruckhart*, 45 Pa. St. 514–520; *Whetstone v. Bowser,* 29 Pa. St. 59; *Stevens v. Kelley*, 57 Am. Rep. 811; *Sweet v. Cutts*, 11 Am. Law Register, 11. Even if the flow or passage of water from "Little Sac" creek to Fulbright spring was by natural seepage, drainage or percolation, and not in well defined channels—surface or subterranean—still the defendants could not rightfully obstruct, impede or hold back, said water for the purpose of injuring plaintiffs by depriving them of the use of said water. Washburn on Easements and Servitudes [2 Ed.] 441; *Wheatley v. Baugh*, 64 Am. Dec. 721; *Greenleaf v. Francis*, 35 Mass. 117; *Chesley v. King*, 43 Am. Rep. 569; *Sweet v. Cutts*, 11 Am. Law Register, 11; *Pixley v. Clark*, 35 N. Y. 520; *Roath v. Driscoll*, 52 Am. Dec. 352; *Bassett v. Salisbury Mfg. Co.*, 82 Am. Dec. 179; *Greenleaf v. Francis*, 18 Pick. 117; *Rychlicki v. City of St. Louis,* 98 Mo. 497; *Schneider v. Railroad*, 29 Mo. App. 68. (2) There is no adequate remedy at law for the wrongs complained

of, and plaintiffs are entitled to the injunction prayed for. *Rogers Locomotive Works v. Railroad*, 20 N. J. Eq. 379; *Indian River Steamboat Co. v. East, etc., Co.*, 29 Am. St. Rep. 258; *Jerome v. Ross*, 11 Am. Dec. 500, and note; *Dudley v. Hunt*, 1 Am. St. Rep. 375; *Delivan Railroad v. Center Stock Co.*, 45 N. J. Eq. 50; *Peoples' Gas Co. v. Tyner*, 31 Am. St. Rep. 433; *Carroll v. Campbell*, 108 Mo. 551–557, and cases cited.

*A. H. Wear, Jas. R. Vaughan* and *P. T. Allen* for respondents.

There is no pretense in the testimony offered by plaintiff, that there was a well defined subterranean channel from defendants' premises to those of plaintiff; and no water was acquired by plaintiff from defendants' spring or pond, unless it was from percolation or seepage. No action accrues to the plaintiff for the diversion of such underground percolating waters. *Railroad v. Peterson*, 14 Ind. 112; *Chase v. Silverstone*, 62 Me. 175; *Halderman v. Bruckhart*, 84 Am. Dec. 511; *Roath v. Driscoll*, 53 Am. Dec. 352; *Chatfield v. Wilson*, 28 Vt. 49; *Wheatley v. Baugh*, 25 Pa. St. 528; *Frazier v. Brown*, 12 Ohio St. 294; *Bloodgood v. Ayers*, 108 N. Y. 400. No malicious intention upon the part of defendants has been established by the testimony; but the question of malice does not enter into this inquiry. *Chatfield v. Wilson*, 28 Vt. 49; *Frazier v. Brown*, 12 Ohio St. 294; *Phelps v. Nowlin*, 72 N. Y. 39; *Hunt v. Simonds*, 19 Mo. 583; *Hunt v. Johnson*, 23 Mo. 434; *Alexander v. Relfe*, 9 Mo. App. 143; *Wheatley v. Baugh*, 25 Pa. St. 528. If there is no right to the percolating water, then the object of the owner is immaterial in damming up the water. A wrong motive in doing a lawful act, can not render the same unlawful or confer a right of property

upon another, where such right did not exist before. *Chambers v. Baldwin*, 34 Am. St. Rep. 165; *Chesley v. King*, 74 Me. 164; *Phelps v. Nowlin*, 72 N. Y. 39; *Bourlier v. Macauly*, 91 Ky. 135; *Jenkins v. Fowler*, 24 Pa. St. 308.

BIGGS, J.—The water supply for the city of Springfield comes from what is know as the Fulbright spring, which is situated about three miles northwest of the city limits. In 1883, the Springfield Water Company, a corporation, entered into a contract to furnish the city with water. The company purchased some twenty or thirty acres of land upon which the Fulbright spring is located, and, by means of pumps and a main pipe leading to a reservoir, the company proceeded to furnish water from this spring to the city. It continued to do so until 1889, when it sold its waterworks, together with its franchises and rights under the contract with the city, to the plaintiff, another corporation. The plaintiff thereafter continued to own and operate the waterworks, and to furnish water to the city and to its inhabitants.

The Fulbright Spring is located at the lower and western limit of a water shed, which ascends eastwardly for a distance of about four miles. The valley of the "Little Sac" river extends from the eastern limit of this water shed, and runs in a westerly direction and passes about one fourth of a mile north of the Fulbright spring, and is separated therefrom by a high ridge or ledge of rock. Two springs form the source or head of the "Little Sac," and are known as the McCrackin and Edmundson Springs. They are about seven hundred yards apart, and the waters coming from them unite and form the channel of the "Little Sac" river. Prior to 1890 the owner of the land upon which these springs are located constructed a dam across the

channel of the river just below where the waters from the two springs unite. The object was to accumulate the water for the purpose of running a small water mill. This dam only partially obstructed the flow of water. In 1890 the defendants purchased the land upon which these springs were located, together with the mill. They removed the old dam and replaced it with another, which was of such dimensions as to prevent the escape of water during the dry season, except by leakage or seepage. It is of the construction of this dam, and the actions of the defendants in reference thereto, that the plaintiff complains in this action.

The substance of the plaintiff's cause of action, as stated in the petition, is that the Fulbright spring is fed from the water falling on the above mentioned area of country, and that the greater portion of the water finds its way into subterranean channels, which are well known and defined, and which lead into the Fulbright spring; that a portion of the water flowing in the channel of the "Little Sac" river, when unobstructed and not diverted, runs into subterranean channels or currents leading into the Fulbright spring, and that such water had always so run until the defendants constructed their dam; that the plaintiff was thus deprived of its use, and that the flow from the Fulbright spring was thus rendered inadequate for the requirements of the city.

It was also averred that, in the construction and management of the dam, the defendants acted maliciously and for the sole purpose of injuring the plaintiff, and not for the purpose of utilizing their own property; that, in the months of August and September, 1893, and during the dry months of the two preceeding years, the defendants without any benefit to themselves, but solely for the purpose of injuring the plaintiff, opened the sluice gates of the dam; that, when the pond was

drained, the gates would be closed and it would take five or six days for the pond to refill; that, when the water was allowed to accumulate in the pond, its pressure would cause sufficient seepage or percolation to prevent any serious diminution of the water supply at the Fulbright spring, but, during the time the pond was refilling, the flow of the water at the spring would appreciably diminish, and that it was for the purpose of inflicting this injury to the plaintiff that the defendants periodically drained their pond.

The prayer is that the defendants be enjoined from opening the gates of the dam, or, if they allowed the water to escape from the pond, that they be enjoined from again stopping or attempting to stop its natural flow. There was a temporary injunction in accordance with the prayer.

The answer of the defendants is a general denial. It is also averred that prior to the building of the dam the defendants attempted to negotiate a sale of their property to the plaintiff, based upon the idea that the plaintiff could utilize and would need the water from their springs to execute the purposes of its incorporation; that the plaintiff insisted that the water from the Fulbright spring was ample for the purpose for which it was used, and that it was wholly unconnected with, and independent of, defendants' springs, and, therefore, the propositions of sale made by the defendants were rejected; and that thereupon the defendants, acting on said representations of plaintiff, constructed its dam for the purpose of establishing a fishery, and in doing so they expended large sums of money. Wherefore, they claim that they ought not to be disturbed in the full enjoyment of their enterprise.

Upon the hearing, the circuit court dissolved the temporary injunction and dismissed the proceeding. The plaintiff has appealed.

The law in reference to the obstruction or diversion of the flow of water in water courses is well established, and it can make no difference that the current or stream is subterranean, provided it has a well defined and known channel. Subterranean passages for water are common in limestone formations, where streams pass entirely under the surface of the ground, and so continue in definite and obvious channels for greater or less distances. No one has the right to interfere with the natural flow of such a stream. But the law, as applicable to water which filtrates or percolates through the soil or interstices of the rock, is almost the reverse. Such water is regarded as a part of the soil and to which an adjoining proprietor has no absolute or natural right, and to which he can acquire no prescriptive right. It belongs to the owner of the land, and its diversion or appropriation by him for the improvement or benefit of his estate can not be made the basis of a complaint against him by anyone, however grievous the resulting injury may be. *Wheatley v. Baugh*, 25 Pa. St. 528; *Roath v. Driscoll*, 20 Conn. 533; *Chatfield v. Wilson*, 28 Vt. 49; *Greenleaf v. Francis*, 18 Pick. 117; *Chasemore v. Richards*, 5 H. & N. 982; *Haldeman v. Bruckhardt*, 45 Pa. St. 514; *Whetstone v. Bowser*, 29 Pa. St. 59; Washburn on Easements, etc., pp. 364-369; *Bloodgood v. Ayers*, 108 N. Y. 400; *Strait v. Brown*, 40 Am. Rep. 497; *Sweet v. Cutts*, 11 Am. Law Reg. 11.

The plaintiff's evidence left no doubt of the fact that the Fulbright spring depended largely for its supply of water on that coming down the "Little Sac" river from the defendants' springs. The evidence was conclusive that, when the sluice gates or valves were opened in the defendants' dam, within five or six hours thereafter there would be a rush of water into the Fulbright spring, which would continue for five or

six hours, the length of time required for the drainage of the pond; that, after the gates in the dam were closed, there would be a corresponding decrease of the flow, which at the times complained of materially and seriously reduced, the supply of water needed for the use of the city. But, whether the water reached the plaintiff's spring by means of a well defined channel, or by means of filtrations or percolations through the soil and seams in the ledges of rock, is a matter of conjecture under the evidence. It was shown by the plaintiff that the water escaped through a small hole in the bed of the "Little Sac" river, and that at another place there was a small seam in the ledge of rock forming its western bank. The cave out of which the Fulbright spring emerges was explored to the northeast to a distance of one fourth or one half mile. At that point a large stream of water was discovered. This evidence was insufficient to show subterranean channels connecting the "Little Sac" river with the Fulbright spring, and on this branch of the case we must hold that the conclusion reached by the circuit court was right.

But the plaintiff claims that, in building the dam, and especially in draining the pond, the defendants acted negligently and maliciously, and for the sole purpose of injuring the plaintiff, and not to improve or add to the value of their property, and that, aside from other considerations, the temporary injunction for this reason ought to have been made perpetual.

In answer to this, the defendants assert, *first*, that a wrong motive in doing a lawful act can afford no just ground of complaint to anyone, and, therefore, if the water from their spring did not flow into the Fulbright spring though fixed and well know channels, they had a perfect legal right to obstruct it, even

though they did it. with a bad motive. We can not agree to this. While it must be conceded that the water from the channel of the "Little Sac" river to the Fulbright spring flows through no perceptible channel, and that the defendants must be regarded as the general owner of the surplus water flowing from their spring, such ownership is not without restrictions against the plaintiff, for it, by reason of its appropriation, has acquired a right thereto which can not be interfered with by a stranger, nor by the defendants, except for some beneficial use of the water or for the betterment of their land. The defendants can not obstruct or divert the water merely for the purpose of injuring the plaintiff. To that extent the principle, "*Sic utere tuo*," *etc.*, applies. This is denied by some authorities, but it has the support of the better reasoned cases. *Chasemore v. Richards*, 5 H. & N., *supra; Wheatley v. Baugh*, *supra; Greenleaf v. Francis*, *supra*. The same principle governs in cases of lateral support. The right to remove the lateral support of a building or other structure is subject to the qualification, that it must be done with ordinary care so as to cause no unnecessary damage to the adjoining proprietor. In the case of *Charless v. Rankin*, 22 Mo. 573, the principle is stated thus: "If a man in the exercise of his own rights of property do damage to his neighbor, he is liable, if it might have been avoided by the use of reasonable care." The same doctrine has been recently affirmed in *Larson v. Railroad*, 110 Mo. 234.

But the defendants deny that they acted with a view to the injury of the plaintiff, or that such a conclusion is fairly deducible from the evidence.

Now let us see if this contention of the plaintiff is supported by the evidence. It makes no special complaint of the construction of the dam. The serious objection is to the frequent drainage of the pond during

the dry weather of 1893, and the two preceding years. The defendants do not deny that during the months of August and September, 1893, and, in fact, during the continuation of the severe drought of that year, which extended into the winter months, they let out the water from their pond about once a week. The defendant Jenkins, who alone testified for the defense, and who seems to have had the entire management of the defendants' property, stated that this was done for the sole purpose of stopping the leakage of water from the pond; that, on account of the holes in its bottom, the water escaped to such an extent that he could not get it high enough to utilize it in running their mill.

In opposition, the plaintiff's evidence tended to show that Jenkins knew the effect of the drainage of the pond on the Fulbright spring; that in 1893, before he began to let the water escape from the pond, he examined the water in plaintiff's reservoir, which was getting low on account of the dry weather; that he also examined the flow of water into the Fulbright spring, which was much less than usual, and that he immediately opened his dam, and that he continued to open and close it at short intervals so long as the drought continued. This was done also during the dry weather of the two preceding years.

The purpose of Jenkins seems to us to be apparent. He had good reason to know that the Fulbright spring was partially fed from the waters flowing from the defendant's springs, and that a diversion of them during extremely dry weather would render a water famine in the city imminent, and would probably compel the plaintiff to purchase the defendants' property. If this was not his purpose, why did he invariably select the periods of drouth to make repairs on the pond? The repairs could as well have been made at other seasons, when no harm would have resulted to the plaintiff or

anyone else; at least there is nothing in the record to show that this course could not have been pursued. In our opinion the plaintiff, under the foregoing circumstances, is entitled to some relief and protection against the repetition of such conduct, and we therefore must dissent from the conclusion of the circuit court on this branch of the case. We do not wish to be understood as denying the right of the defendants, as against the plaintiff, to maintain their dam for the purposes stated, or for any other useful purpose. We also concede their right to drain the pond for the purpose of stopping leakage, but they should be prevented from doing this at a time when it would result in material damage to the plaintiff. This is not an unreasonable restraint, for the evidence is uncontradicted that for the greater portion of every year the drainage of the pond would result in no appreciable damage to the plaintiff.

The judgment of the circuit court will, therefore, be reversed, and the cause remanded with directions to enter the following decree in favor of the plaintiff: That the said defendants, and each and every one of them, their agents, servants and employees, be, and are hereby, enjoined from maliciously interfering with the natural flow of water in the "Little Sac" river below the dam erected by said defendants on said stream in the year 1891; that, for that purpose, they be enjoined from opening the flood gates of said dam, for the purpose of draining the pond formed thereby, during the dry season of any year, that is to say, during the months from July to October, both inclusive, oftener than once a month, and that they be enjoined from opening said flood gates for the purposes aforesaid at any time without a previous notice in writing given to the plaintiff herein of their intention so to do, and that the plaintiff have leave to apply from time to time to

the court for such additional orders in the premises, as will fully protect it in the decree hereby entered, and that the plaintiff recover of the defendants the cost of this proceeding. Judge ROMBAUER concurs in this opinion; Judge BOND dissents.